# IN THE SUPREME COURT OF TEXAS

═══════════

No. 09-0481

═══════════

SUSAN COMBS, COMPTROLLER OF PUBLIC ACCOUNTS
OF THE STATE OF TEXAS, AND GREG ABBOTT,
ATTORNEY GENERAL OF THE STATE OF TEXAS,
PETITIONERS,

v.

TEXAS ENTERTAINMENT ASSOCIATION, INC.
AND KARPOD, INC., RESPONDENTS

═══════════════════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS

═══════════════════════════════════════════════

**Argued March 25, 2010**

JUSTICE HECHT delivered the opinion of the Court.

A Texas statute requires a business that offers live nude entertainment and allows the consumption of alcohol on its premises to remit to the Comptroller a $5 fee for each customer admitted. We are asked to decide whether the statute violates the right to freedom of speech guaranteed by the First Amendment to the United States Constitution. We hold it does not. We reverse the judgment of the court of appeals[1] and remand the case to the trial court for further proceedings.

---

[1] 287 S.W.3d 852 (Tex. App.–Austin 2009).

# I

In 2007, the Legislature enacted the Sexually Oriented Business Fee Act.[2] Section 102.052(a) states: "A fee is imposed on a sexually oriented business in an amount equal to $5 for each entry by each customer admitted to the business."[3] A "sexually oriented business" is specially defined as

> a nightclub, bar, restaurant, or similar commercial enterprise that:
>
> (A)   provides for an audience of two or more individuals live nude entertainment or live nude performances; and
>
> (B)   authorizes on-premises consumption of alcoholic beverages, regardless of whether the consumption of alcoholic beverages is under a license or permit issued under the Alcoholic Beverage Code.[4]

The fee is imposed on the business, not the customer, and the business is given "discretion to determine the manner in which [it] derives the money required to pay the fee".[5] The Comptroller estimates that there are 169 such businesses in Texas. The first $25 million collected is to be

---

[2] TEX. BUS. & COM. CODE §§ 102.051-.056. These provisions were first enacted as sections 47.051-.056, Law of May 25, 2007, 80th Leg., R.S., ch. 1206, § 3, 2007 Tex. Gen. Laws 4082, 4082-4083, but were renumbered in 2009, Law of May 11, 2009, 81st Leg., R.S., ch. 87, § 4.004, 2009 Tex. Gen. Laws 208, 214. We use the current numbering.

[3] TEX. BUS. & COM. CODE § 102.052(a).

[4] *Id.* § 102.051(2). "Nude" is defined as "(A) entirely unclothed; or (B) clothed in a manner that leaves uncovered or visible through less than fully opaque clothing any portion of the breasts below the top of the areola of the breasts, if the person is female, or any portion of the genitals or buttocks." *Id.* § 102.051(1).

[5] *Id.* § 102.052 (a), (c).

credited to the sexual assault program fund,[6] and the balance is to be used to provide health benefits

coverage premium payment assistance to low-income persons.[7]

Respondents Karpod, Inc., the operator of a sexually oriented business defined by the Act

and the Texas Entertainment Association (TEA), an association representing the interests of such

businesses in Texas, sued the Comptroller and the Attorney General (collectively, the Comptroller)

for declaratory and injunctive relief, asserting that the fee violates the free-speech guarantee of the

First Amendment.[8]  After a bench trial, the trial court concluded that:

- "erotic nude/topless dancing is protected expression under the First Amendment";

- the fee "is a content-based tax" on such expression;

- the Comptroller "failed to — and concedes [she] cannot — meet her burden under strict scrutiny to show that the [tax] is necessary to serve a compelling state interest and narrowly tailored for that purpose"; and

- "[e]ven if the [tax] could be considered a content-neutral measure . . . , it fails intermediate scrutiny."

Accordingly, the trial court rendered judgment declaring that the statute violates the First

Amendment, permanently enjoining collection of the fee, and awarding respondents attorney fees.

---

[6] *Id*. § 102.054.

[7] *Id*. § 102.055(a).

[8] Respondents also asserted that the fee violates three provisions of the Texas Constitution: article I, § 8, guaranteeing free speech; article VII, § 3, relating to occupation taxes; and article VIII, § 2, requiring that taxes be equal and uniform.  The trial court did not rule on these claims, and the court of appeals did not address them.  287 S.W.3d 852, 857 n.5, 864 n.12 (Tex. App.–Austin 2009).  We express no opinion on these issues.

3

A divided court of appeals affirmed.[9]  The majority concluded that the statutory fee is a "content-based" tax — one directed at constitutionally protected expression in nude dancing — for essentially two reasons.  First, whether the fee applies depends on the nature of a business's activities, whether they constitute "live nude entertainment or live nude performances" within the meaning of the statute.[10]  Representatives for the Comptroller testified, that to audit a business, they would be required to examine the content of the expression or "essence" of the transaction; for example, they would consider a "wet T-shirt contest"[11] to come within the definition but perhaps not plays or comedy shows.[12]  Second, the statute "single[s] out a specific class of First Amendment speakers" who are "conveying a message that the taxing body might consider undesirable".[13]  "A selective taxation scheme in which an entity's tax status depends entirely on the content of its speech is 'particularly repugnant to First Amendment principles.'"[14]

---

[9] 287 S.W.3d 852 (Tex. App.–Austin 2009).

[10] *Id*. at 858.

[11] The Comptroller had earlier proposed –  and later adopted –  a rule giving a "wet T-shirt contest" as its only concrete example; see 34 TEX. ADMIN. CODE 3.722 (providing at (c) (3) that: "[a] business that holds occasional events described in subsection(a)(3)of this section, but does not habitually engage in the activity described in subsection (a)(3) of this section is liable for the sexually oriented business fee for those occasional events. For example, a nightclub that hosts a wet t-shirt contest is liable for the fee based upon attendance during the event"), proposed and filed with the Secretary of State in December 2007, and adopted in June 2008. 33 Tex. Reg. 64-66 (January 4, 2008) (proposed);  33 Tex. Reg. 4907-4908 (June 20, 2008) (adopted).  The witness who drafted the rule did not explain the rule's omission of any examples of non-taxable events or content.

[12] 287 S.W.3d at 860.

[13] *Id*. at 859.

[14] *Id*. at 860 (quoting *Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 229 (1987)).

4

The majority rejected the Comptroller's argument that because the government can ban public nudity completely, as the United States Supreme Court held in *City of Erie v. Pap's A.M.*,[15] it can impose a lesser restriction — a $5 fee.[16] The important difference between the ban upheld in *Pap's A.M.* and the fee, the majority reasoned, is that the ban applied to all nudity while the fee singles out nude entertainment and performances.[17]

The Comptroller argues that the fee is directed, not at expression in nude dancing, but at the negative secondary effects of nude entertainment, especially in the presence of alcohol — rape, sexual assault, prostitution, disorderly conduct, and a variety of other crimes and social ills — and in this respect is similar to the zoning ordinance the Supreme Court upheld in *City of Los Angeles v. Alameda Books, Inc.*[18]  The appeals court majority also rejected this argument, though the members differed in their reasoning.  One believed that "a tax on speech is not necessarily content-neutral simply because it is aimed at secondary effects", and that "evidence that the [fee] is aimed at reducing secondary effects of sexually oriented businesses does not preclude the proper application of strict scrutiny".[19] The other argued that the fee might be upheld if there were evidence

[15] 529 U.S. 277 (2000).

[16] 287 S.W.3d at 861.

[17] *Id.*

[18] 535 U.S. 425 (2002).

[19] 287 S.W.3d at 861(citing *Alameda Books,* 535 U.S. at 449 (Kennedy, J., concurring)).

that the Legislature actually intended to address secondary effects when the statute was enacted, but concluded that no such evidence existed.[20]

Having determined that the fee is "a content-based differential tax burden on protected speech", the majority accepted the Comptroller's concession that the fee could not withstand strict scrutiny[21] — that is, the fee is not "a precisely drawn means of serving a compelling state interest".[22] But they added that "[e]ven if we were to consider the . . . tax to be content-neutral, it would fail constitutional muster under the intermediate-scrutiny standard because it is not narrowly tailored to further a substantial governmental interest."[23] The dissent would have held that the fee met the intermediate scrutiny standard.[24]

We granted the Comptroller's petition for review.[25]

## II

Respondents, like the court of appeals, insist that the statutory fee in this case is really a tax. The Comptroller acknowledges that one purpose of the statute is to generate revenue and concedes that her position on respondents' First Amendment challenge does not depend on whether the fee is really a tax or on the Act's dedication of the revenue to specific funds. Accordingly, we assume

---

[20] *Id*. at 869-870 (Jones, C.J., concurring).

[21] *Id*. at 864.

[22] *Consol. Edison Co. of New York, Inc. v. Pub. Serv. Comm'n*, 447 U.S. 530, 540 (1980).

[23] 287 S.W.3d at 864, n. 12.

[24] *Id*. at 870.

[25] 53 Tex. Sup. Ct. J. 285 (Feb. 12, 2010).

the fee is a tax, although we refer to it as a fee because the statute does, and we do not take into consideration the uses for which the revenue is to be put.

We have been cited to only one case involving a tax directed at adult entertainment. In *Bushco v. Utah State Tax Commission*, the Supreme Court of Utah upheld a ten percent gross receipts tax on "businesses in which individuals perform services while nude or partially nude", including "escort services", against a First Amendment challenge.[26] In so doing, the court relied heavily on the United States Supreme Court's decisions in *Pap's A.M.*[27] and *Alameda Books*.[28] Inasmuch as those cases are the Supreme Court's most recent pronouncements on the validity of restrictions on adult entertainment, we, too, look to them for guidance.

## A

*Pap's A.M.* involved a public indecency ordinance passed by the City of Erie, Pennsylvania, that made it an offense to knowingly or intentionally appear in public in a "state of nudity."[29] To comply with the ordinance, nude erotic dancers were required to "wear, at a minimum, 'pasties' and a 'G-string.'"[30] Pap's A.M., which operated an establishment known as Kandyland that featured nude erotic dancing, challenged the ordinance as a violation of the First Amendment.[31] The

---

[26] 225 P.3d 153, 157-158 (Utah 2009), *cert. denied sub nom. Denali, L.L.C. v. Utah State Tax Comm'n*, 131 S.Ct. 455 (2010).

[27] 529 U.S. 277 (2000).

[28] 535 U.S. 425 (2002).

[29] *Pap's A.M.*, 529 U.S. at 28 (plurality opinion).

[30] *Id*. at 283.

[31] *Id*. at 284.

Supreme Court held that the ordinance was not required to pass strict scrutiny and did not violate the First Amendment.[32] Justice O'Connor's plurality opinion announcing the Supreme Court's judgment was joined by Chief Justice Rehnquist, Justice Kennedy, and Justice Breyer.[33] Justice Scalia and Justice Thomas agreed that the ordinance did not violate the First Amendment, but because it regulated only conduct, not expression.[34] Justice Souter agreed with the plurality opinion's analytical approach but would have remanded for further evidence regarding the purpose and operation of the ordinance.[35] Justice Stevens, joined by Justice Ginsburg, dissented.[36]

Justice O'Connor's plurality opinion begins by noting that the expressive conduct in nude dancing "falls only within the outer ambit of the First Amendment's protection."[37] The opinion concludes that "the governmental purpose in enacting the [ordinance was] unrelated to the suppression of expression,"[38] and therefore the ordinance "should be evaluated under the framework set forth in [*United States v. O'Brien*[39]] for content-neutral restrictions on symbolic speech."[40] The plurality reached this conclusion for essentially two reasons. First, it noted that the ordinance was

---

[32] *Id.* at 295-296, 302.

[33] *Id*. at 282.

[34] *Id*. at 307-310 (Scalia, J., concurring in judgment).

[35] *Id*. at 310-311 (Souter, J., concurring in part and dissenting in part).

[36] *Id*. at 317 (Stevens, J., dissenting).

[37] *Id*. at 289 (plurality opinion) (citing *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 565-566 (1991).

[38] *Pap's A.M.*, 529 U.S. at 289 (plurality opinion).

[39] 391 U.S. 367, 377 (1968).

[40] *Pap's A.M.*, 529 U.S. at 289 (plurality opinion).

8

"on its face a general prohibition on public nudity"[41] that did not "target nudity that contains an

erotic message".[42] Second, the plurality explained that the ordinance was

> aimed at combating crime and other negative secondary effects caused by the
> presence of adult entertainment establishments . . . and not at suppressing the erotic
> message conveyed by this type of nude dancing. Put another way, the ordinance
> does not attempt to regulate the primary effects of the expression, *i.e.,* the effect on
> the audience of watching nude erotic dancing, but rather the secondary effects, such
> as the impacts on public health, safety, and welfare, which we have previously
> recognized are "caused by the presence of even one such" establishment.[43]

The plurality rejected the argument that because a ban on all public nudity bans nude

dancing, it necessarily suppresses expression.[44] The plurality looked to the purpose of the ban rather

than its effect:

> The State's interest in preventing harmful secondary effects is not related to the
> suppression of expression. In trying to control the secondary effects of nude
> dancing, the ordinance seeks to deter crime and the other deleterious effects caused
> by the presence of such an establishment in the neighborhood.[45]

The plurality also rejected the argument that the city council's real opposition to nude dancing could

be shown by statements made by the city attorney.[46] "[T]his Court will not strike down an otherwise

constitutional statute," the plurality stated, "on the basis of an alleged illicit motive" on the part of

---

[41] *Id*. at 290.

[42] *Id.*

[43] *Id*. at 291 (citing *Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 47-48, 50(1986)).

[44] *Pap's A.M.*, 529 U.S. at 291-292 (plurality opinion).

[45] *Id*. at 293 (citing *Renton*, 475 U.S. at 50-51).

[46] *Id*. at 292.

9

the enactors.[47]  Finally, the Court observed, even if the public nudity ban had "some minimal effect

on the erotic message by muting that portion of the expression that occurs when the last stitch is

dropped," nude dancers were still "free to perform wearing pasties and G-strings."[48]

> Any effect on the overall expression is *de minimis*.  And as Justice STEVENS eloquently stated for the plurality in *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 70 (1976), "even though we recognize that the First Amendment will not tolerate the total suppression of erotic materials that have some arguably artistic value, it is manifest that society's interest in protecting this type of expression is of a wholly different, and lesser, magnitude than the interest in untrammeled political debate," and "few of us would march our sons and daughters off to war to preserve the citizen's right to see" specified anatomical areas exhibited at [adult entertainment] establishments . . . .  If States are to be able to regulate secondary effects, then *de minimis* intrusions on expression such as those at issue here cannot be sufficient to render the ordinance content based.[49]

Having concluded that Erie's ordinance was not directed to suppressing expression, the

plurality applied the four-part test set out in *O'Brien*:

> Whatever imprecision inheres in these terms, we think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.[50]

As for the first factor, "Erie's efforts to protect public health and safety [were] clearly within the

city's police powers."[51]  As for the second, Erie's "asserted interests of regulating conduct through

---

[47] *Id.*

[48] *Id.* at 294.

[49] *Id.* (internal citation omitted).

[50] *United States v. O'Brien*, 391 U.S. 367, 377 (1968).

[51] *Pap's A.M.*, 529 U.S. at 296.

a public nudity ban and of combating the harmful secondary effects associated with nude dancing

[were] undeniably important."[52]  Erie was not required to

> conduct new studies or produce evidence independent of that already generated by other cities to demonstrate the problem of secondary effects, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses.  Because the nude dancing at Kandyland is of the same character as the adult entertainment at issue in [*Renton v. Playtime Theatres, Inc.,* 475 U.S. (1986)], *Young v. American Mini Theatres, Inc.*, 427 U.S. 50 (1976), and *California v. LaRue,* 409 U.S. 109 (1972), it was reasonable for Erie to conclude that such nude dancing was likely to produce the same secondary effects.[53]

Moreover, the plurality thought it "evident that, since crime and other public health and safety

problems are caused by the presence of nude dancing establishments like Kandyland, a ban on such

nude dancing would further Erie's interest in preventing such secondary effects."[54] While "requiring

dancers to wear pasties and G-strings may not greatly reduce these secondary effects,"[55] certainly

not as much as "a requirement that the dancers be fully clothed,"[56] the plurality stated that "the city

must be allowed a reasonable opportunity to experiment with solutions to admittedly serious

problems"[57] and "must balance its efforts to address the problem with the requirement that the

restriction be no greater than necessary to further the city's interest."[58]

---

[52] *Id.*

[53] *Id.* (internal quotation marks and citation omitted).

[54] *Id.* at 300-301.

[55] *Id.* at 301.

[56] *Id.*

[57] *Id.* (internal quotation marks and citation omitted).

[58] *Id.*

11

In determining whether to apply the *O'Brien* test, the plurality had already determined that Erie's ordinance met the test's third factor — that it be unrelated to the suppression of free expression.[59] And the fourth factor —

> that the restriction is no greater than is essential to the furtherance of the government interest — is satisfied as well. The ordinance regulates conduct, and any incidental impact on the expressive element of nude dancing is *de minimis*. The requirement that dancers wear pasties and G-strings is a minimal restriction in furtherance of the asserted government interests, and the restriction leaves ample capacity to convey the dancer's erotic message.[60]

Justice Scalia, joined by Justice Thomas, would have more upheld the ordinance "because, as a general law regulating conduct and not specifically directed at expression, it is not subject to First Amendment scrutiny at all."[61] "Moreover," Justice Scalia continued,

> even were I to conclude that the city of Erie had specifically singled out the activity of nude dancing, I still would not find that this regulation violated the First Amendment unless I could be persuaded (as on this record I cannot) that it was the communicative character of nude dancing that prompted the ban. When conduct other than speech itself is regulated, it is my view that the First Amendment is violated only where the government prohibits conduct precisely because of its communicative attributes. Here, even if one hypothesizes that the city's object was to suppress only nude dancing, that would not establish an intent to suppress what (if anything) nude dancing communicates. I do not feel the need, as the Court does, to identify some secondary effects associated with nude dancing that the city could properly seek to eliminate. (I am highly skeptical, to tell the truth, that the addition of pasties and G-strings will at all reduce the tendency of establishments such as Kandyland to attract crime and prostitution, and hence to foster sexually transmitted disease.) The traditional power of government to foster good morals (*bonos mores*), and the acceptability of the traditional judgment (if Erie wishes to endorse it) that

---

[59] *Id.*

[60] *Id.*

[61] *Id.* at 307-308 (Scalia, J., concurring in judgment) (quoting *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 572 (1991) (Scalia, J., concurring in judgment)).

nude public dancing *itself* is immoral, have not been repealed by the First Amendment.[62]

**B**

In *Alameda Books*, the City of Los Angeles had enacted a zoning ordinance prohibiting more than one adult entertainment business in the same building.[63] The United States Supreme Court reversed summary judgment that held that the ordinance violated the First Amendment.[64] Justice O'Connor announced the Court's judgment in an opinion joined by Chief Justice Rehnquist, Justice Scalia, and Justice Thomas.[65] Justice Scalia wrote a brief concurring opinion.[66] Justice Kennedy concurred in the judgment.[67] Justice Souter, joined by Justice Stevens and Justice Ginsburg, and in part by Justice Breyer, dissented.[68] The members of the Supreme Court all proceeded from the premise that, as the Court had held in *Renton v. Playtime Theatres, Inc.*, a "time, place, and manner" zoning restriction on an adult business does not violate the First Amendment if it is aimed, not at the content of adult entertainment, but at the secondary effects of such businesses on the surrounding community — that is, if the restriction is "designed to prevent crime, protect the city's retail trade, maintain property values, and generally protect and preserve the quality of the city's neighborhoods,

---

[62] *Id*. at 310 (internal quotation marks and citation omitted).

[63] 535 U.S. 425, 429 (2002) (plurality opinion).

[64] *Id.* at 430.

[65] *Id*. at 428.

[66] *Id*. at 443 (Scalia, J., concurring).

[67] *Id*. at 444 (Kennedy, J., concurring in judgment).

[68] *Id*. at 453 (Souter, J., dissenting).

13

commercial districts, and the quality of urban life, not to suppress the expression of unpopular views."[69] Such restrictions "are acceptable so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication."[70] The disagreement in *Alameda Books* was over whether there was evidence that the ordinance at issue satisfied *Renton*'s requirements.

Justice O'Connor's plurality opinion concluded that a 1977 study conducted by Los Angeles supported its determination, reflected in the ordinance, that diluting the concentration of adult businesses would reduce their negative secondary effects on the community.[71] The adult businesses that challenged the ordinance argued that the study did not show that the ordinance would reduce those secondary effects, and could be read to show that the ordinance might worsen them. The plurality concluded that municipalities were not obliged to justify such ordinances with exacting proof but could "rely upon evidence that is 'reasonably believed to be relevant' to the secondary effects that they seek to address."[72]

Justice Kennedy agreed. "[W]e have consistently held that a city must have latitude to experiment, at least at the outset, and that very little evidence is required" to adopt a zoning ordinance like Los Angeles'.[73] "As a general matter," he wrote, "courts should not be in the

---

[69] 475 U.S. 41, 48 (1986) (internal quotation marks and brackets omitted).

[70] *Id*. at 47.

[71] *Alameda Books*, 535 U.S. at 438 (plurality opinion).

[72] *Id.* at 442.

[73] *Id*. at 451 (Kennedy, J., concurring in judgment).

14

business of second-guessing fact-bound empirical assessments of city planners."[74] A city is entitled

to rely on its knowledge of the conditions in its community, Justice Kennedy acknowledged, "and

if its inferences appear reasonable, we should not say there is no basis for its conclusion."[75] But, he

stressed, for an ordinance to avoid strict scrutiny, evidence supporting it was required to show more

than that secondary effects would be reduced.

> [T]he necessary rationale for applying intermediate scrutiny is the promise that zoning ordinances like this one may reduce the costs of secondary effects without substantially reducing speech. For this reason, it does not suffice to say that inconvenience will reduce demand and fewer patrons will lead to fewer secondary effects. This reasoning would as easily justify a content-based tax: Increased prices will reduce demand, and fewer customers will mean fewer secondary effects. But a content-based tax may not be justified in this manner. It is no trick to reduce secondary effects by reducing speech or its audience; but a city may not attack secondary effects indirectly by attacking speech.[76]

Rather, "a city must advance some basis to show that its regulation has the purpose and effect of

suppressing secondary effects, while leaving the quantity and accessibility of speech substantially

intact."[77] The study on which Los Angeles relied, Justice Kennedy concluded, provided that basis.

### III

Guided by *Pap's A.M.* and *Alameda Books*, we turn to whether the fee in this case is

"content-based" — that is, directed to the suppression of expression. The court of appeals

concluded that the fee is content-based because it would not be imposed in all incidents of "live nude

---

[74] *Id.*

[75] *Id.* at 452.

[76] *Id.* at 450 (internal citations omitted).

[77] *Id.* at 449.

entertainment or live nude performances" — instead, the determination to apply the fee would be made only with reference to the nature of that performance or the business. Justice Kennedy expressly rejected this reasoning in *Alameda Books*. "[T]here is no First Amendment objection", he said, to a measure that

> decrease[s] the crime and blight associated with certain speech by the traditional exercise of its zoning power, and at the same time leave[s] the quantity and accessibility of the speech substantially undiminished, . . . even if the measure identifies the problem outside by reference to the speech inside — that is, even if the measure is in that sense content based.[78]

The court of appeals also concluded that the fee is content-based because it singles out nude dancing, as opposed to all nudity, and, and so "target[s] a specific class of First Amendment speakers".[79] The court deemed it immaterial that the fee does not apply to nude dancing where alcohol is not consumed, or to other forms of expression involving nudity.[80] We disagree. The fee is not aimed at any expressive content of nude dancing but at the secondary effects of the expression in the presence of alcohol.

The court of appeals dismissed *Pap's A.M.*, because that case involved a total ban on nudity, as unhelpful in analyzing whether the fee in this case is content-based.[81] But the extent of the ban was only one factor in the Supreme Court's analysis. More important, in our analysis of the multiple opinions in that case, was the fact that the ordinance was directed to reducing the negative secondary

---

[78] *Id*. at 445.

[79] 287 S.W.3d at 859.

[80] *Id.* at 862-863.

[81] 287 S.W.3d at 858-859, 861.

16

effects of adult entertainment businesses. Respondents do not deny the existence of such effects, which the Supreme Court has repeatedly recognized, or that they are especially associated with alcohol-consumption. Respondents have not challenged the trial court's finding that the Comptroller "presented persuasive trial evidence supporting a possible link between the business activity subject to the tax and the secondary effects" associated with sexual abuse. Rather, they argue that the fee does nothing to reduce secondary effects. But logic and the evidence indicate that the fee provides some discouragement to combining nude dancing with alcohol consumption.

The court of appeals' apparent belief that any imposition on expression violates the First Amendment is contradicted by the recognition in *Pap's A.M.* that a restriction can be *de minimis*. In that case, the ban could be avoided simply by using pasties and G-strings. We think a $5 fee presents no greater burden on nude dancing. Respondents argue that, because the fee is so small, it is unlikely to have much effect in combating the negative secondary effects that the Comptroller contends it is intended to reduce. But *Pap's A.M.* rejects a similar argument.[82]

The court of appeals and respondents argue that a tax is different from the zoning restriction in *Alameda Books*. They point to Justice Kennedy's statement that a content-based tax may not be justified as suppressing the secondary effects of adult entertainment if it targets expression.[83] That, of course, is true of a zoning restriction as well as a tax. Justice Kennedy reasoned that zoning restrictions are typically less suspect that taxes:

---

[82] *See City of Erie v. Pap's A.M.*, 529 U.S. 277, 301 (2000) (rejecting a similar argument because "*O'Brien* requires only that the regulation further the interest in combating" negative secondary effects).

[83] *Alameda Books*, 535 U.S. at 450 (Kennedy, J., concurring in judgment).

17

> [Z]oning regulations do not automatically raise the specter of impermissible content discrimination, even if they are content based, because they have a prima facie legitimate purpose: to limit the negative externalities of land use. As a matter of common experience, these sorts of ordinances are more like a zoning restriction on slaughterhouses and less like a tax on unpopular newspapers. The zoning context provides a built-in legitimate rationale, which rebuts the usual presumption that content-based restrictions are unconstitutional.[84]

But he did not suggest that a fee like the one now before us would never be permissible. The fee is not a tax on unpopular speech but a restriction on combining nude dancing, which unquestionably has secondary effects, with the aggravating influence of alcohol consumption.

Finally, respondents argue that the negative effects from adult entertainment are not secondary effects but primary effects — the response to the erotic content of nude dancing. If that were true, then surely nude dancing could be subject to more direct restrictions, just as shouting "fire" in a crowded theater can be. In any event, the characterization of the societal ills that result from adult entertainment as primary rather than secondary was expressly rejected by Justice O'Connor's plurality opinion in *Pap's A.M.*

The fee in this case is clearly directed, not at expression in nude dancing, but at the secondary effects of nude dancing when alcohol is being consumed. An adult entertainment business can avoid the fee altogether simply by not allowing alcohol to be consumed. For these reasons, we conclude that the fee is not intended to suppress expression in nude dancing.

**IV**

---

[84] *Id.* at 449.

Therefore, the fee need only satisfy the *O'Brien* test. Respondents do not contest that the fee meets the first factor — that the Legislature had the constitutional power to enact it. Nor do they contest, with respect to the second factor, that the State has an important interest in reducing the secondary effects of adult businesses. But they argue that the fee does not further that interest. We think that the fee provides some disincentive to present live nude entertainment where alcohol is consumed, and, consistent with Justice Kennedy's views in *Alameda Books*, the Legislature could reasonably infer that the alternative of non-alcoholic venues was sufficient so as not to work a suppression of expression in nude dancing.

Respondents argue that the lack of discussion about reduction of secondary effects during the legislative process shows that such reduction was not the fee's purpose. But the Supreme Court has rejected the argument that the constitutional validity of a restriction on freedom of speech should turn on the subjective intent of those who enacted it. In *O'Brien*, the Court said:

> It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive. . . . What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork.[85]

Regardless of what legislators said or did not say during the fee's enactment, the fee does further the State's interest in reducing secondary effects.

We have already explained at length why we have concluded that the fee meets the third factor of the *O'Brien* test — that the State's interest is unrelated to the suppression of free expression. With respect to the fourth factor — that the restriction on alleged First Amendment

---

[85] *United States v. O'Brien*, 391 U.S. 367, 383-384 (1968).

freedoms is no greater than is essential to the furtherance of that interest — we reiterate two things. The $5 fee is a minimal restriction on the businesses, so small that respondents argue it is ineffective. And the business that seeks to avoid the fee need only offer nude entertainment without allowing alcohol to be consumed.

*       *       *

Because the fee is content-neutral and satisfies the four-part *O'Brien* test, we conclude that it does not violate the First Amendment. Accordingly, we reverse the judgment of the court of appeals and remand the case to the trial court to consider issues raised by respondents under the Texas Constitution.

Nathan L. Hecht
Justice

Opinion delivered: August 26, 2011

20